UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

THE LOOP PRODUCTION,

      Plaintiff,

   -v-                                No. 10 Civ. 3058 (LTS) (MHD)

CAPITAL CONNECTIONS LLC et al.,

      Defendants.

-------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

      In this action, Plaintiff The Loop Production ("Plaintiff") asserts claims pursuant to the Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and New York State common law doctrines against Defendants Capital Connections LLC, Escobar Entertainment, Inc., and various individuals who are allegedly agents of the institutional defendants (collectively, "Defendants"). The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1332.

      On October 26, 2010, Plaintiff moved for default judgments against Defendants Capital Connections LLC, Escobar Entertainment, Inc., Durburt O'Neal Brandon, Jr., Melvin Breeden, and Alisha E. Harris (the "Defaulting Defendants"). On November 9, 2010, Defendants Capital Connections LLC and Brandon (the "Moving Defendants") moved to (1) vacate the Clerk of Court's order of default pursuant to Federal Rule of Civil Procedure 55(c) and (2) dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Moving Defendants' motion to vacate the entry of default is denied, the Moving Defendants'

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 0 6 JUN 2011

motion to dismiss the Complaint is denied, and Plaintiff's motion for a default judgment is granted.

BACKGROUND

The following material allegations of Plaintiff's Complaint and uncontroverted declarations are deemed established under Federal Rule of Civil Procedure 8(b)(6) for the purposes of the instant default judgment motion practice due to the Defaulting Defendants' failure to respond to the Complaint or otherwise proffer an alternate set of facts.

<u>Plaintiff's Initial Contact with Defendants</u>

On or about October 13, 2009, Plaintiff visited Defendant Capital Connections LLC's website to find an artist to perform at an event in Taiwan on December 31, 2009. (Compl. ¶ 33.) The website represented that Capital Connections, doing business as Capital Connections Agency ("CCA"), was "the largest booking agency in the United States" and listed famous personalities including Barack Obama, Michelle Obama, Bill Gates, Oprah Winfrey, Tiger Woods, Venus Williams, and Britney Spears among its clientele. (Id. ¶¶ 25-28.) Plaintiff then contacted Defendant Brandon, CCA's President, via email to inquire about booking a recording artist for a performance at Plaintiff's New Year's Eve party. (Compl. ¶ 33; Declaration of Durbert Brandon in Support of Motion to Dismiss ("Brandon Decl.") ¶ 1.) On or about November 4, 2009, Brandon responded and identified several recording artists, including Nelly, Ja Rule, and Bobby Brown, whom CCA could make available for Plaintiff's New Year's Eve event. (Id. ¶ 34.) Plaintiff's agent then spoke via telephone with Brandon and Defendant Breeden to discuss retaining the services of Nelly for the New Year's Eve performance. (Id. ¶ 35.) During the conversation, and in subsequent phone calls, both Brandon and Breeden claimed

that CCA represented Nelly and had the authority to retain him for Plaintiff's performance. (Id.)

Brandon then sent a contract (the "Contract") to Plaintiff's agent, requesting advance payment of

$40,000 – the entire fee to secure Nelly for the event. (Id. ¶ 36.)

On or about November 11, 2009, Plaintiff received a copy of the Contract from

CCA signed by Defendant Harris on behalf of CCA. (Id. ¶ 37.)  The Contract indicated that

Harris was working out of CCA's "East Coast Office," located at an undisclosed street address in

New York, New York, with a zip code of 10019. (Id. ¶ 38; Brandon Decl. Ex. A.)  The Contract

contained a choice of law provision stating that New York law would govern the parties'

agreement. (Compl. ¶ 39.)  The Contract further provided that any dispute arising under the

contract would be subject to arbitration in New York, New York. (Brandon Decl. Ex. A ¶ 18.)

On or about November 12, 2009, David Hsia executed the Contract on behalf of

Plaintiff and faxed it to CCA. (Compl. ¶ 40.)  On the same day, an agent of Plaintiff spoke with

Defendants Brandon and Breeden. (Id.)  They acknowledged receipt of the Contract and

confirmed that CCA would retain Nelly to perform at Plaintiff's New Year's Eve event so long

as Plaintiff wired $40,000 to CCA within 36-48 hours. (Id.)  Within twelve hours of Brandon's

and Breedon's request, Plaintiff successfully wired $40,000 to CCA's bank account in North

Carolina. (Id. ¶ 41.)

Defendants' Inability to Produce Nelly and Plaintiff's Demand for a Refund

On or about November 16, 2009, Defendant Brandon contacted Plaintiff, stating

that CCA had not received the wire transfer. (Id. ¶ 45.)  Brandon further stated that, because of

Plaintiff's inability to transfer the funds to CCA, CCA would not arrange for Nelly to perform on

New Year's Eve. (Id.)  Plaintiff contacted CCA's bank and confirmed that the funds had in fact

been deposited in CCA's account.  (Id. ¶ 46.)  Plaintiff then emailed CCA, stating that the transaction had gone through successfully on November 12, 2009, and providing the serial number verifying the wire transfer.  (Id.)

The next day, Defendant Brandon emailed Plaintiff with a changed story.  He stated that CCA had, in fact, received the wire transfer but, because CCA received the transfer a day late – on November 12 instead of November 11 – Plaintiff had breached the parties' agreement.  (Id. ¶ 47.)  Brandon stated that CCA would keep the $40,000 already wired by Plaintiff unless Plaintiff agreed to use the funds as partial payment towards booking another performer, Ja Rule, instead of Nelly.  (Id. ¶ 49.)  Plaintiff knew that CCA's representation that it could hire Ja Rule was false because Plaintiff had already booked Ja Rule for its New Year's Eve event through another agent.  (Id. ¶ 51.)

On or about November 18, 2009, Plaintiff's attorneys contacted Defendant Brandon demanding a refund from CCA.  (Id. ¶ 52.)  On or about November 19, 2009, CCA responded, claiming that Plaintiff had breached the parties' agreement.  (Id. ¶ 53.)  During the next four months, Plaintiff and its attorneys sent several emails and letters to CCA's agents requesting a refund.  (Id. ¶ 54.)  Plaintiff forwarded copies of the correspondence to Nelly's true manager.  (Id. ¶ 55.)  Nelly's manager informed Plaintiff that Nelly and his agents had never heard of CCA and that CCA did not have the authority to book Nelly.  (Id. ¶ 56.)  Plaintiff also contacted the true agent for Flo Rida, another recording artist who CCA claimed to represent, and learned that CCA did not have the authority to book him either.  (Id. ¶ 57.)

On or about November 21, 2009, Defendant Brandon emailed Plaintiff claiming that CCA would refund Plaintiff's payment, but could not complete the transaction because CCA

did not have Plaintiff's bank account information.  (Id. ¶ 58.)  CCA, however, had already

received Plaintiff's bank account information through the original wire transfer on November 12,

2009, and in letters sent by Plaintiff requesting a refund.  (Id.)

On or about December 22, 2009, Plaintiff contacted CCA by telephone.  (Id. ¶

59.)  Defendant Brandon answered the phone and stated that his partner, Defendant Breeden, was

also on the call.  (Id.)  During the call, Plaintiff stated that it had spoken with Nelly's true

manager and that Plaintiff knew CCA did not have the authority to book Nelly for the New

Year's Eve performance.  (Id. ¶ 60.)  Brandon responded that he was not afraid of legal action

because it would be too costly for Plaintiff to litigate the matter.  (Id. ¶ 61.)  Plaintiff then

informed Brandon and Breeden that it had reported CCA to law enforcement authorities.  (Id. ¶

62.)  Brandon and Breeden proposed to refund $35,000 in return for a full release and settlement

of the matter as well as a commitment from Plaintiff to inform law enforcement that CCA had

returned the funds.  (Id. ¶ 63.)

On December 22, 2009, Defendant Brandon emailed Plaintiff and represented that

CCA had returned $35,000 via wire transfer and demanded that Plaintiff waive all potential

claims in return.  (Id. ¶ 64.)  The transfer could not be completed because CCA provided

Plaintiff's bank with the correct account number but the wrong account name in the wire

instructions.  (Id. ¶ 64.)  Plaintiff's bank stated that it would reject the wire transfer unless CCA

supplied the correct account name.  (Id. ¶ 65.)  CCA allegedly provided the incorrect account

information to deliberately prevent the funds from ever reaching Plaintiff's account.  (Id. ¶ 66.)

On or about December 24, 2009, Plaintiff contacted CCA and requested that it correct the wire

instructions.  (Id. ¶ 67.)  On or about December 27, 2009, Brandon responded with a denial that

CCA had made any mistake in the wire instructions and further stated that the refund was complete.  (Id. ¶ 68.)  On or about January 4, 2010, the funds were returned to CCA's account.  (Id. ¶ 69.)

On or about January 8, 2010, CCA emailed Plaintiff and stated that it would not refund Plaintiff's payment.  (Id. ¶ 77.)  CCA's message also stated that Plaintiff would receive a credit of $35,000 towards another booking, which Plaintiff would forfeit if the credit was not used within sixty days.  (Id.)

On January 28, 2010, Plaintiff held a conference call with CCA.  (Id. ¶ 78.)  Defendant Brandon claimed that his attorney was present on the call, but the individual he identified as his attorney disclaimed his status as a member of the bar and stated that he had no knowledge of CCA.  (Id.)  Brandon then hung up the phone and ended the call.  (Id.)

Plaintiff Brings Suit Against Defendants

On April 9, 2010, Plaintiff filed the Complaint in this action.  (Dkt. no. 1.)  Plaintiff located and served Defendants CCA and Brandon on April 27, 2010.  (Declaration of Justin M. Sher in Opposition to Defendants' Motion to Set Aside Default ("Sher. Decl. in Opp.") Ex. 1.)  In May, 2010, Plaintiff's counsel consented to extending Defendants' time to answer the complaint from May 18 to June 2 in exchange for CCA's counsel, Eric S. Medina, Esq., providing information on where to locate other Defendants.  (Id. Ex. 2.)  On June 10, 2010, Mr. Medina sent Plaintiff's counsel information on the whereabouts of Defendants Escobar Entertainment, Breeden, Harris, Souza, and Mata.  (Id. ¶ 7.)  Mr. Medina received this information through Defendant Brandon.  (Id.)  The information turned out to be largely inaccurate.  (Id.)

On June 24, 2010, Plaintiff's counsel sent Mr. Medina a letter stating that Plaintiff would move for a default judgment if CCA failed to respond to the Complaint by July 2, 2010. (Id. Ex. 6.)  Mr. Medina never responded to the letter.  (Id. ¶ 9.)  On July 2, 2010, Plaintiff's counsel wrote a letter to the Court requesting permission to file a motion for a default judgment against the four Defendants upon whom Plaintiff had effectuated service: Capital Connections LLC, Escobar Entertainment, Inc., Durbert O'Neal Brandon, Jr., and Alisha E. Harris.  (Id. Ex. 7.)  On July 8, 2010, the Court granted the request.  (Id. Ex. 8.)  On July 9, 2010, Plaintiff served copies of his July 2 letter and the Court's July 8 Order on the four Defendants.  (Id. Ex. 9.)  On August 17, 2010, Plaintiff served Defendant Breeden.  (Id. Ex. 10.)  Breeden never responded to the Complaint.  (Id.)  On September 15, 2010, the Court granted Plaintiff's application to seek a default judgment against Breeden.  (Dkt. no. 22.)

On September 29, 2010, the Clerk of Court certified that Defendants Capital Connections LLC, Escobar Entertainment, Inc., Brandon, Harris, and Breeden had not responded to the Complaint and noted their default.  (Sher Decl. in Opp. Ex. 11.)  Plaintiff moved for a default judgment against the five Defendants on October 26, 2010.  (Dkt. no. 24.)  On November 10, 2010, the Moving Defendants appeared through Mr. Medina to oppose Plaintiff's motion for a default judgment and file a motion to dismiss.  (Dkt. no. 28.)

Plaintiff's Claimed Damages

Accounting for ticket sales, liquor and food sales, sales of VIP booths, sponsorships, performance fees, artist accommodations, and operation costs, Plaintiff projected profits of $222,500 for the New Year's Eve party with Nelly as a scheduled performer. (Declaration of David Hsia ("Hsia Decl.") ¶¶ 25-30.)  Plaintiff's actual profits for the event

without Nelly were $34,000.  (Id. ¶ 55.)  Plaintiff alleges that it could not meet its projection

because Nelly did not perform at the event and, consequentially, fewer people bought tickets,

consumed liquor and food, and purchased VIP booths.  (Id. ¶ 51.)  Including the $40,000 wire

transfer that was never refunded, Plaintiff claims total damages of $228,500.  (Id. ¶ 57.)

Time Expended by Plaintiff's Counsel

        Plaintiff's counsel, Justin M. Sher, Esq., expended 116.4 hours working on this

litigation.  (Declaration of Justin M. Sher in Support of Plaintiff's Motion for Default Judgment

("Sher Decl. in Support") ¶ 4.)  Mr. Sher's regular billing rate is $400.  (Id. ¶ 5.)  Mr. Sher asserts

that his fee to Plaintiff would be $46,560.  (Id. ¶ 6.)

DISCUSSION

The Moving Defendants' Motion to Set Aside Entry of Default and to Dismiss the Complaint

        Rule 55(a) of the Federal Rules of Civil Procedure states that the clerk of court

must enter a party's default if it "has failed to plead or otherwise defend" in an action.  Fed. R.

Civ. P. 55(a).  A court may set aside an entry of default for "good cause."  Fed. R. Civ. P. 55(c).

Three factors determine good cause: (1) whether the default was willful; (2) whether the

adversary has presented a meritorious defense; and (3) whether setting the default aside would

prejudice the adversary.  See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 243

(2d Cir. 1994).  The Moving Defendants argue that consideration of these three factors warrants

setting aside the Clerk's entry of their default because they have demonstrated good cause for

failing to respond to the Complaint.  The Moving Defendants further assert that the existence of

an arbitration clause in the Contract and alleged lack of personal jurisdiction warrant dismissal of

the Complaint.  As shown below, the Moving Defendants' arguments are meritless and their

motion must be denied.

A.     Willfulness of Default

"As to the first factor, willfulness requires something more than mere negligence, such as egregious or deliberate conduct, although the degree of negligence in precipitating a default is a relevant factor to be considered." Odfjell Seachem A/S v. Continental De Petrols Et Invs. SA, 613 F. Supp. 2d 497, 500 (S.D.N.Y. 2009) (citations and internal quotation marks omitted).  In Odfjell, the court found willful default by the defendant where the "plaintiff, after properly serving [the] defendants, went further and gave written notice to its adversary of the various in-court conferences, and advised [the defendants] that, should they fail to move, answer, or even just appear in the proceedings, plaintiff would seek default judgment." Id.

Here, after serving the Moving Defendants, Plaintiff sent them and their attorney, Mr. Medina, three letters advising that their failure to respond would result in Plaintiff moving for a default.  The Moving Defendants counter that any delay in responding to the Complaint was done in good faith while the parties were engaged in settlement negotiations and while Mr. Medina gathered information on where other potential defendants could be located. (Certification of Eric S. Medina, Esq., in Support of Motion to Dismiss ¶¶ 4-5.)  Mr. Medina further represents that he failed to respond to the Complaint because his receipt of mail was delayed due to a change of address, yet, he admits that he received many of Plaintiff's notices electronically.  (Id.)  The Moving Defendants' counsel's own sworn statement thus makes it clear that his clients were on notice that Plaintiff was prepared to move for a default judgment.  Still, they never responded to the Complaint.  This conduct is sufficiently deliberate to warrant characterization of the Moving Defendants' default as willful.

B.      Meritorious Defenses

         The second factor, whether the defendant can assert a meritorious defense, is a

"key factor" in a court's consideration of a motion for a default judgment. New York v. Green,

420 F.3d 99, 109 (2d Cir. 2005). "In order to make a sufficient showing of a meritorious defense

. . . the defendant need not establish his defense conclusively, but he must present evidence of

facts that, if proven at trial, would constitute a complete defense." SEC v. McNulty, 137 F.3d

732, 740 (2d Cir. 1998) (citations and internal quotation marks omitted). The Moving

Defendants address this factor by asserting that: (1) Plaintiff cannot establish personal

jurisdiction over them; (2) the case must be sent to arbitration pursuant to the Federal Arbitration

Act; and (3) even if the case can survive a motion to dismiss, the Moving Defendants will be able

to prevail on various contractual defenses, including anticipatory breach, repudiation, unclean

hands, and accord and satisfaction. None of their arguments is sufficient.

         1.      Personal Jurisdiction

         The Moving Defendants' personal jurisdiction argument is meritless, as both of the

Moving Defendants are clearly subject to personal jurisdiction in New York based on their own

representations and admissions. Any court in New York State "may exercise personal

jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through

an agent . . . transacts any business within the state[,]" with respect to a cause of action arising

from that transaction of business. N.Y. C.P.L.R. § 302(a)(1). Negotiating a single contract

signed in New York is enough to confer personal jurisdiction over a defendant even if the

defendant never set foot in New York State. See Parke-Bernet Galleries, Inc. v. Franklyn, 26

N.Y.2d 13, 16-17 (N.Y. 1970); Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15

N.Y.2d 443, 456 (N.Y. 1965).  Here, the Complaint alleges that Defendant Harris, CCA's agent, transacted business within New York State by signing the Contract on behalf of CCA in CCA's New York office, located in "New York, New York, 10019."  (Brandon Decl. Ex. A.)  The Moving Defendants do not contest Harris' agency relationship with CCA.  Additionally, Defendant Brandon was the contact who negotiated Nelly's appearance for the performance, demanded that money be paid to CCA, and sent the contract to Plaintiff.  (Compl. ¶¶ 34-36.) Brandon thus transacted business in New York State when he allegedly participated in negotiations about the Contract.  The Moving Defendants do not dispute Plaintiff's characterization of Brandon's involvement in the contract negotiations.  Consequently, the uncontroverted factual allegations in the Complaint sufficiently demonstrate a basis for the Court to assert personal jurisdiction over both Moving Defendants and the Moving Defendants have failed to present a meritorious defense of lack of personal jurisdiction.

2.     Arbitration

The Contract contains an arbitration clause.  The Federal Arbitration Act ("FAA") recognizes, however, that an arbitration clause is not enforceable if grounds "exist at law or in equity for the revocation of any contract."  9 U.S.C.A. § 2 (West 2011).  "'[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements' in accordance with § 2 of the FAA."  Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 570 (S.D.N.Y. 2009) (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).  Thus, if the contract containing an arbitration clause is void under the applicable state law, arbitration may not be compelled.  See Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31-32 & n.3 (2d Cir. 2001).  Here, Plaintiff alleges that the entire

Contract was fraudulently procured as part of a fraudulent scheme by Defendants to mislead potential clients into believing that CCA represented artists whom it did not represent, agreeing to bookings that CCA could not fulfill, and demanding payments for which it did not intend to provide return performance.  Plaintiff thus contends that the entire contract, including the arbitration clause, is invalid.

      Under New York law, fraud will invalidate a contract, and any arbitration clause contained therein, where the fraudulent conduct was "part of a grand scheme that permeated the entire contract."  Weinrott v. Carp, 32 N.Y.2d 190, 196 (N.Y. 1973).  "An intentional scam would permeate the contract with fraud and render it void ab initio and unenforceable."  Bongo-Astier v. Carefree Lifestyles, Inc., 910 N.Y.S.2d 403 (Table), 2010 WL 1509339, at *1 (N.Y. Civ. Ct. Mar. 18, 2010).  Here, the uncontroverted allegations of the Complaint (which are deemed admitted pursuant to Federal Rule of Civil Procedure 8(b)(6) by virtue of Defendants' failure to respond) demonstrate that the entire transaction proposed by Defendants, including the Contract, was a sham designed to perpetrate their fraudulent scheme.  Defendants did not have an agency relationship with Nelly and thus could not make him available for the New Year's Eve performance.  Defendants further misrepresented who they were – advertising that CCA is "the largest booking agency in the United States."  Thus, because the Contract was simply a means to defraud Plaintiff out of $40,000 and not a legally enforceable agreement, the entire agreement, including its arbitration provision, is void and the Moving Defendants' effort to cast the existence of the arbitration clause as a meritorious defense, particularly in the absence of any factual proffer calling into question Plaintiffs' allegations of fraud, is unavailing.

      3.    <u>Contractual Defenses</u>

The Moving Defendants assert that "there exist meritorious defenses . . . including[,] but not limited to, anticipatory breach, repudiation, unclean hands, and accord and satisfaction[,]" (Defs.' Reply at 2), but offer no factual elucidation of that assertion.  This conclusory statement is insufficient to demonstrate that the Moving Defendants have any meritorious contractual defenses.

> C.    Prejudice to the Non-Defaulting Party

"The final factor a court must consider . . . is whether and to what extent, vacating the default judgment will prejudice the non-defaulting party." Green, 420 F.3d at 111.  "[D]elay [in obtaining a judgment] is not a sufficient basis for establishing prejudice." Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983).  "Rather, it must be shown that delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" Id. (quoting 10 Charles Alan Wright, et al, Federal Practice & Procedure § 2699 (1983)).  "An absence of prejudice to the nondefaulting party would not in itself entitle the defaulting party to relief from the judgment [because] '[c]ourts have an interest in expediting litigation, [and] abuses of process may be prevented by enforcing those defaults that arise from egregious or deliberate conduct.'" McNulty, 137 F.3d at 738 (quoting Am. Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996)) (third alteration in original).  Thus, a court may grant a motion for default judgment even if the record does not strongly support a finding of prejudice, so long as the moving party establishes willful default and the absence of any meritorious defense. See Commercial Bank of Kuwait, 15 F.3d at 244.  Furthermore, Plaintiff has proffered, and the Moving Defendants do not dispute, that in the time since Plaintiff filed suit, CCA has changed its website by removing information about Defendants Harris and

Escobar Entertainment. (Sher Decl. in Opp. Ex. 12.) CCA has also altered its website to hide contact information for the website's registrant that had previously been publicly available. (Id. ¶ 18.) Moreover, Defendant Harris has relocated to an unknown address, further complicating Plaintiff's ability to recover from her in the future. (Id.) These facts plainly demonstrate that any further delay might result in the loss of evidence and difficulty in obtaining discovery.

D.    Conclusion

As explained above, the Moving Defendants have failed to demonstrate their entitlement to the vacatur of the Clerk's entry of default. Their purported grounds for dismissal of the Complaint are also meritless on this record. Accordingly, their motion is denied in its entirety.

Plaintiff's Motion for Judgment by Default

Plaintiff seeks judgment by default against each of the Defaulting Defendants, an award of damages against each of them, jointly and severally, and punitive damages. For substantially the reasons explained above in connection with the denial of the Moving Defendants' motion to vacate the defaults and to dismiss the Complaint, the Court finds that disposition of the merits of this action through default motion judgment practice is appropriate. The Court thus turns to the question of whether the record before it is sufficient to demonstrate Plaintiffs' entitlement to relief. The Complaint asserts six causes of action: (1) a RICO violation; (2) conspiracy to violate RICO; (3) common law fraud and fraudulent inducement; (4) aiding and abetting fraud; (5) breach of contract; and (6) conversion. As explained below, viewing all of the facts alleged in the Complaint as true, the Court finds that Plaintiff is entitled to a default judgment in its favor on all counts except the breach of contract claim.

A.     First Claim for Relief: RICO Violation

1.      18 U.S.C. § 1962(c) Violation

Plaintiff alleges that Defendants Brandon and Breeden violated RICO by working as agents of CCA and participating in a pattern of racketeering activity.  Section 1962(c) of Title 18 makes it unlawful for any person "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C.A. § 1962(c) (West 2011).  To establish a RICO violation, a plaintiff must allege and prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  "The Supreme Court has construed the otherwise broad language of section 1962(c) regarding conduct to require that the defendant 'participated in the operation or management' of the enterprise itself and had 'some part in directing the enterprise's affairs' to be liable."  Sykes v. Mel Harris and Assocs., LLC, 757 F. Supp. 2d. 413, 427 (S.D.N.Y. 2010) (quoting Reves v. Ernst & Young, 507 U.S. 170, 179 (1993)).  An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (citation and internal quotation marks omitted); see also 18 U.S.C.A. § 1961(4) (West 2011).  At least two acts of racketeering activity within a span of ten years are required to establish a "pattern" of racketeering activity.  18 U.S.C.A. § 1961(5) (West 2011).  Racketeering activity includes wire fraud in violation of 18 U.S.C. § 1343. See 18 U.S.C.A. § 1961(1)(B) (West 2011).  Wire fraud is "any scheme or artifice to defraud . . . by means of false or fraudulent pretenses,

representations, or promises . . . transmitted by means of wire . . . in interstate or foreign commerce . . . ."  18 U.S.C.A. § 1343 (West 2011).

A complaint alleging wire fraud as the predicate act of a RICO claim must allege: "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."  S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996) (citing United States v. Gelb, 700 F.2d 875, 879 (2d Cir. 1983)).

Plaintiff alleges that Defendants Brandon and Breeden, as agents of CCA, engaged in several acts of wire fraud as part of a larger scheme to defraud Plaintiff of $40,000. Specifically, the Complaint asserts that Brandon and Breeden engaged in the following predicate acts, all of which occurred in 2009 and 2010: (1) posting false information on the internet concerning CCA's clients and size of operations; (2) falsely posing in email messages as Nelly's agent; (3) falsely stating in email messages that CCA had not received Plaintiff's $40,000 deposit; (5) falsely stating in email messages that CCA returned Plaintiff's $40,000 deposit; and (5) falsely stating in an email message that CCA had the authority to retain Ja Rule for the New Year's Eve performance.  (Compl. ¶ 82.)  These facts are uncontroverted due to Brandon's and Breeden's default and are therefore deemed admitted pursuant to Federal Rule of Civil Procedure 8(b)(6).  Through this fraud, Plaintiff claims that Brandon and Breeden caused damages totaling $228,500.  (Hsia Decl. ¶ 57.)  Thus, the Complaint sufficiently alleges a § 1962(c) violation by Brandon and Breeden.

2.    Plaintiff's § 1964(c) Claim

Section 1964(c) of Title 18 provides a civil damages action to any person injured

in his business or property by reason of a violation of section 1962. See 18 U.S.C.A. § 1964(c).

(West 2011).  To state a claim under § 1964(c), a plaintiff "must plead, at a minimum, '(1) the

defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3)

causation of the injury by the defendant's violation.'" Lerner v. Fleet Bank, N.A., 318 F.3d 113,

120 (2d Cir. 2003) (quoting Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271

F.3d 374, 380 (2d Cir. 2001)).  As shown above, the uncontroverted factual allegations of the

Complaint are sufficient to establish Brandon and Breeden's violation of § 1962(c).  Brandon's

and Breeden's § 1962(c) violation allegedly caused an injury to Plaintiff's business because

Plaintiff not only lost the money it wired to CCA, but also suffered lost profits and harm to its

business reputation.  (Compl. ¶¶ 72-75.)  Because Brandon and Breeden are deemed to have

admitted the allegations in the Complaint by virtue of their default, Plaintiff has sufficiently

alleged its entitlement to relief under § 1964(c).

      B.     Second Claim for Relief: Conspiracy to Violate RICO

          Plaintiff alleges that all Defaulting Defendants conspired to violate RICO.  It is

"unlawful for any person to conspire to violate" any of the substantive provisions of RICO.  18

U.S.C.A. § 1962(d) (West 2011).  A RICO conspiracy is "an agreement to conduct or to

participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering."

United States v. Pizzonia, 577 F.3d 455, 464 (2d Cir. 2009) (citing United States v. Persico, 832

F.2d 705, 713 (2d Cir. 1987)).  A defendant can commit a RICO conspiracy where he "know[s]

the general nature of the conspiracy and that the conspiracy extends beyond [his] individual

role[]." United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) (citation and internal

quotation marks omitted).  Section 1964(c) provides civil damages for persons injured by a RICO

conspiracy.

Plaintiff asserts that all Defendants knowingly and willfully conspired to further the goals of CCA and that all Defendants intended to assist and support CCA in transmitting fraudulent representations over its website in order to defraud persons seeking to hire artists to perform at events. (Compl. ¶¶ 87-88.) Because of the Defaulting Defendants' knowing and willful failure to respond to the Complaint, each of them is deemed pursuant to Federal Rule of Civil Procedure 8(b)(6) to have admitted these allegations; in any event, none of them has proffered any facts that could frame a genuine issue as to Plaintiff's allegations of fraudulent, conspiratorial activity accomplished through wire fraud. Plaintiff has thus met its burden of establishing its entitlement to relief as against all of the Defaulting Defendants for the injury it allegedly sustained by reason of the RICO conspiracy.

C.      Third Claim for Relief: Common Law Fraud and Fraudulent Inducement

Plaintiff asserts its third claim for relief against Defendants CCA, Brandon, Breeden, and Harris. The elements of a fraud claim under New York law are "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citation omitted). "The elements of a claim for fraudulent inducement are similar: the defendant must have made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that misrepresentation to its injury." Id. (citation omitted).

The uncontroverted facts in the Complaint, deemed admitted under Federal Rule of Civil Procedure 8(b)(6) due to the Defaulting Defendants' knowing and willful failure to respond, show that Defendants CCA, Brandon, Breeden, and Harris made numerous false statements to Plaintiff concerning their representation of Nelly and other artists and the size and stature of CCA. (Compl. ¶ 92.)  The Complaint further alleges that these misrepresentations were made knowingly and with the purpose of defrauding Plaintiff out of $40,000.  (Id. ¶ 93) Plaintiff relied on the misrepresentations and suffered damages as a result.  (Id.)  Plaintiff has therefore met its burden of establishing its entitlement to relief against CCA, Brandon, Breeden, and Harris for common law fraud and fraudulent inducement.

> D.    Fourth Claim for Relief: Aiding and Abetting Fraud

Defendant Harris is the only Defaulting Defendant against whom Plaintiff asserts its claim of aiding and abetting fraud.  A plaintiff asserting a claim of aiding and abetting fraud must allege (1) existence of the underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance in perpetrating the fraud.  See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud or breach of fiduciary duty] to occur."  Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007) (citations and internal quotation marks omitted) (alteration in original).  As discussed above, Plaintiff has demonstrated the existence of the underlying fraud by Defendant Harris.  The Complaint further alleges that Harris substantially assisted the fraud by executing the Contract, thus adding to the illusion that CCA represented and could produce Nelly for the New Year's Eve performance.  (Compl. ¶¶ 37, 102-03.)  Harris, due

to her default, has failed to proffer any facts indicating otherwise and thus is deemed to admit these allegations as true pursuant to Federal Rule of Civil Procedure 8(b)(6).  Consequently, Plaintiff has met its burden of establishing its entitlement to relief against Harris for aiding and abetting fraud.

E.    Fifth Claim for Relief: Breach of Contract

Plaintiff asserts its breach of contract claim against Defendant CCA only.  As explained above, the Court adopts Plaintiff's uncontroverted allegations that the Contract is void. This is not a case in which Plaintiff could allege both fraud and breach of contract.  Cf. Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc, 500 F.3d 171, 183-84 (2d Cir. 2007) (discussing parallel fraud and breach of contract actions).  Therefore, Plaintiff is not entitled to a default judgment on its breach of contract claim.

F.    Sixth Cause of Action: Conversion

Plaintiff asserts its conversion claim against Defendants CCA, Brandon, Breeden, and Harris.  "The common law cause of action for conversion in New York is defined as the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  Dover v. Assemi, No. 08-cv-1337, 2009 WL 2870645, at *5 n.15 (S.D.N.Y. Aug. 5, 2009) (citations and internal quotation marks omitted).  Here, Plaintiff has alleged that the $40,000 it wired to CCA rightfully belonged to Plaintiff.  (Compl. ¶ 112.) The Complaint claims that CCA intentionally retained and exercised control over the money without permission.  (Id. ¶¶ 113-14.)  Upon information and belief, Plaintiff asserts that CCA distributed that money to, among others, Defendants Brandon, Breeden, and Harris.  (Id. ¶ 115.) Therefore, assuming the facts alleged in the Complaint to be true due to those Defendants'

default, the Court finds that Plaintiff has met its burden of demonstrating its entitlement to
judgment by default on its conversion claim against CCA, Brandon, Breeden, and Harris.

Damages

Upon the entry of a party's default, a court should accept "as true all of the factual
allegations of the complaint, except those relating to damages." Au Bon Pain Corp. v. Artect,
Inc., 653 F.2d 61, 65 (2d Cir. 1981). Any award of damages must be established by the
prevailing party "unless the amount is liquidated or susceptible of mathematical computation."
Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974). However, a court need not conduct a hearing
to determine damages, so long as it has "ensured that there was a basis for the damages specified
in the default judgment." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109
F.3d 105, 111 (2d Cir. 1997). A plaintiff prevailing on a civil RICO theory "shall recover
threefold the damages he sustains and the cost of the suit[.]" 18 U.S.C.A. § 1964(c) (West
2011).

Plaintiff determined that its New Year's Eve party with Nelly as one if its featured
performers would generate profits of $222,500. (Hsia Decl. ¶ 37.) This estimate accounts for
revenue from projected ticket sales, liquor and food sales, sales of VIP booths, and sponsorships,
and expenses including performance fees, artist accommodations, and operation costs. (Id. ¶¶
25-30.) Plaintiff alleges that far fewer people attended the party because Nelly was not going to
perform and, as a result, the event only generated $34,000 of profits, $188,500 less than what
they had expected to earn. (Id. ¶ 55.) Plaintiff claims total damages of $228,500, which
represents the $40,000 wire transfer that was never refunded and $188,500 of lost profits. (Id. ¶
57.) The Defaulting Defendants have not contested the amount or calculation of this claim.

Therefore, the Court finds that Plaintiff has met its burden of proving that it has sustained

damages by reason of the Defaulting Defendants' fraudulent activity, including the alleged RICO

violations.

Based on the Defaulting Defendants' failure to contest the allegations made in the

Complaint and in Plaintiff's affidavits, the Court finds that Plaintiff has demonstrated entitlement

to a judgment as follows:

- Claim 1 – RICO Violation: Base amount of damages $228,000.  With treble damages

  pursuant to 18 U.S.C. § 1964(c), damages of $684,000 jointly and severally against

  Defendants Brandon and Breeden.

- Claim 2 – Conspiracy to Violate RICO: Base amount of damages $228,000.  With treble

  damages pursuant to 18 U.S.C. § 1964(c), damages of $684,000, jointly and severally

  against all Defaulting Defendants.

- Claim 3 – Common Law Fraud and Fraudulent Inducement: $228,000, jointly and

  severally against Defendants CCA, Brandon, Breeden, and Harris.

- Claim 4 – Aiding and Abetting Fraud: $228,000 against Defendant Harris.

- Claim 5 – Breach of Contract: Default judgment motion denied.

- Claim 6 – Conversion: $40,000 plus prejudgment interest against all Defaulting

  Defendants.

Plaintiff's request for punitive damages is denied.[1]

---

[1]      "Punitive damages are awarded for the purpose of deterrence and retribution [and]
should only be awarded if the defendant's culpability is so reprehensible as to warrant
the imposition of damages over and above the award of compensatory damages. In
determining the degree of reprehensibility of the defendant's conduct, the court should
consider (1) whether the harm caused was physical, as opposed to merely economic;

In conclusion, Plaintiff is entitled to $684,000 in damages from all Defaulting Defendants jointly and severably.  Plaintiff is entitled to prejudgment interest on $40,000 of this amount.

Attorneys' Fees

A plaintiff prevailing on a civil RICO claim is entitled to an award of "a reasonable attorney's fee[.]"  18 U.S.C.A. § 1964(c) (West 2011).  Plaintiff's counsel expended 116.4 hours working on this litigation.  (Sher Decl. in Support ¶ 4.)  Mr. Sher's regular billing rate is $400.  (Id. ¶ 5.)  Mr. Sher thus asserts that his fee to Plaintiff would be $46,560.  (Id. ¶ 6.)  The Moving Defendants do not dispute the reasonableness or amount of Mr. Sher's proposed fee.  The Court thus finds that Mr. Sher is entitled to the reasonable fee award of $46,560.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for a default judgment is granted on all counts except count five, breach of contract, upon which Plaintiff cannot recover.  The Moving Defendants' motion to vacate the clerk's entry of default is denied and the Moving Defendants' motion to dismiss is denied.

The initial pretrial conference, scheduled for June 15, 2011, is adjourned.

---

(2) whether the tortious conduct evinced an indifference to, or a reckless disregard of, the health and safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the tortious conduct involved repeated actions, or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or was a mere accident."  Fagan v. AmerisourceBergen Corp., 356 F. Supp. 2d 198, 220 (E.D.N.Y. 2004) (internal quotation marks and citations omitted).  The harm in this case was principally economic and Plaintiff, a company with experience in booking performance artists, cannot be said to have been particularly vulnerable.  Additionally, the Defaulting Defendants are being assessed treble damages under the RICO statute, and such damages meet the purposes of retribution and deterrence.

Plaintiff is directed to file a statement with the Court by June 20, 2011, indicating whether its claims against the unserved Defendants, the ABC Corporations, and John Doe Defendants should be dismissed without prejudice and whether judgment should be entered against the Defaulting Defendants.  The Defaulting Defendants shall respond to this statement by July 5, 2011.  Plaintiff shall have until July 12, 2011, to file a reply.  Courtesy copies must be provided for chambers contemporaneously with filing.

The Clerk of Court is respectfully directed to terminate docket entry numbers 24 and 28.


SO ORDERED.

Dated: New York, New York
       June 6, 2011

                                                        LAURA TAYLOR SWAIN
                                                  United States District Judge